IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAULETTE TITUS-MORRIS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BANC OF AMERICA CARD SERVICING ) <br> CORP., ) <br> ) <br> Defendant. ) <br> ) | C.A. No. 09-cv965 |

## MEMORANDUM

**I.     INTRODUCTION**

The plaintiff, Paulette Titus-Morris ("Titus-Morris"), filed a Complaint (D.I. 2) against Banc of America Card Servicing Corporation and MNBA American Legacy (collectively, "Banc of America")[1], on December 17, 2009. (*Id.*) Titus-Morris appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (D.I. 4.) In her Complaint, Titus-Morris alleges that Banc of America's termination of her employment constitutes employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (D.I. 2 at ¶¶ 1, 10.) On February 9, 2011, following completion of discovery, Banc of America filed a Federal Rule of Civil Procedure 56(c) Motion for Summary Judgment (D.I. 18), asserting that Titus-Morris' allegations are meritless as her termination from Banc of America resulted from months of substandard performance (D.I. 19 at 8). Presently before the court is Banc of America's Motion for Summary Judgment. For the reasons that follow, the court will grant Banc of America's motion.

---

[1] Titus-Morris' complaint identifies "Bank of America/MBNA America Legacy" as the defendant. Banc of America states that no such entity exists and that "Banc of America Card Servicing Corp." is Titus-Morris' former employer and is the entity that waived service and answered in this matter.

## II. BACKGROUND

The following facts are taken from Titus-Morris' Complaint and, where indicated, relevant deposition statements. (D.I. 2; D.I. 2, Ex. 1; D.I. 19, Ex. 1-4.) Titus-Morris began working for MBNA Corporation in October 2003[2] and became a Banc of America employee following Bank of America Corporation's merger with MBNA Corporation. (D.I. 19 at 6.) Titus-Morris' employment with Banc of America ended due to termination on March, 16, 2007. (D.I. 2, Ex. 1 at 5.)

As a Fraud Application Prevention Analyst ("Fraud Analyst"), Titus-Morris reviewed potentially fraudulent credit card applications, performed data verifications, made decisions on whether to approve or deny, and, if necessary, requested additional information on each application. (D.I. 19, Ex. 3 at ¶ 3.) Banc of America required Titus-Morris to meet certain performance metrics, including productivity and quality. (*Id.* at ¶ 4.) Banc of America measured productivity by the number of approval or denial decisions made per hour. (*Id.*) Quality was measured by a Team Manager, who reviewed twenty randomly-selected decisions made per month. (*Id.*) Fraud analysts were expected to maintain a productivity level of at least ninety percent of the standard rate and a quality level of at least ninety-six percent of the standard rate. (*Id.*)

Throughout her time at Banc of America, Titus-Morris' evaluations documented that her performance needed improvement. *See* Tr. at 178:21-24, 179:1-21. In August 2006, Titus-Morris was given a First Warning for submitting balance transfers that exceeded a customer's assigned credit limit in violation of company policy. (D.I. 19, Ex. 2 at ¶ 3.) In November 2006, Titus-Morris' productivity level was reported as 73.87% of the standard rate and in December 2006, her quality level was 88% of the standard rate. (*Id.* at ¶¶ 8-9.) On January 24, 2007,

---

[2] *See* Deposition of Paulette Titus-Morris, November 11, 2010 ("Tr.") at 64:1-4.

2

Titus-Morris met with her manager, Andrea Sulecki, who informed Titus-Morris that she would be given a final warning if she underperformed for a third consecutive month. (*Id.* at ¶ 10.) Nevertheless, in January 2007, Titus-Morris' productivity level was reported at 48.49% of the standard rate and her quality level was 92.68% of standard rate. (*Id.* at ¶ 11.)

On February 2, 2007, Titus-Morris met, at her request, with Steve Ryder, Banc of America's Operational Director for Fraud Application Prevention. (*Id.*, Ex. 2 at ¶¶ 2, 4.) During this meeting, Titus-Morris expressed complaints about her various former managers.[3] (*Id.* at ¶ 4.) Ryder was already familiar with some of the incidents Titus-Morris discussed, but told her that he would look into her other allegations. (*Id.*) Ryder also told Titus-Morris that Banc of America was in the process of determining the next step in advancing her corrective action based on her performance in January 2007. (*Id.*) Ryder followed up with Titus-Morris' managers on February 5, 2007, and concluded that Titus-Morris' claims were meritless. (*Id.* at ¶ 5.)

On February 8, 2007, Ryder and Sulecki met with Titus-Morris to administer a final warning for failure to meet performance expectations for November 2006, December 2006, and January 2007. (*Id.*, ¶ 6.) Ryder also let Titus-Morris know that he followed up with Titus-

---

[3] Per an internal memorandum Steve Ryder filed on February 14, 2007, Titus-Morris:
> [e]xplained that she has had a series of difficulties with various managers since she started. . . . She explained that her first manager, Jeff Reymos, critized her and questioned her leadership skills for not attending a team function that was outside the bank. She said that Scott Timmons (no longer employed) did not provide feedback and was very argumentative with her. At one point, she escalated an issue to Lance Miller when he was responsible for Fraud Application Prevention. She said that Lance used the analogy of the Terrell Owens situation at the that time with the Philadelphia Eagles to threaten her. She said Lance made the point that T.O. should be fired for his actions which were detrimental to the team. Paulette said she thought this was a direct correlation to her escalating an issue to Lance. . . . Paulette also said she felt as though Jim Wilson did not like her and was trying to fire her. She referenced a conversation in which Jim referred to her as "aggressive." She felt that term was offensive. She also said that when she worked for Anne Hryack, she was not treated faily. She said that Anne made her go through Health & Safety Services to get a doctor's note to allow more frequent bathroom breaks when she was pregnant. She said that other people in the department did not have to provide a doctor's note. She also said that one of the tardiness [sic] from July was when she took her lunch break and 15 minute break to take an important call. She said Anne was aware of this, but still counted tardy against her.

D.I. 19, Ex. 4 at 1.

Morris' managers on February 5, 2007, and concluded that there was no merit to the claims Titus-Morris made on February 2, 2007. (*Id.*)

A few hours after Titus-Morris received her final warning, she sent an email to Ken Lewis, the CEO, President, and Chairman of Bank of America, and Bruce Hammonds, the Card Services Executive, relaying essentially the same complaints she presented to Ryder. (D.I. 19, Ex. 2 at ¶ 7.) Mark Morris, a Human Resources Senior Advisor at Banc of America, investigated Titus-Morris' complaints and, on February 21, 2007, told Titus-Morris that her manager complaints were unsubstantiated and that the performance-based warnings issued against her were warranted and would remain in place. (*Id.* at ¶¶ 2-5.)

In February 2007, Titus-Morris' productivity level was reported as 49.77% of the standard rate. (*Id.*, Ex. 3 at ¶ 14.) On March 2, 2007, Sulecki and Ryder met with Titus-Morris to discuss her productivity level. (*Id.* at ¶ 15.) Despite this meeting, Titus-Morris' productivity level remained far below the minimum productivity level of at least 90% of the standard rate throughout the first two weeks of March 2007. (D.I. 19, Ex. 3 at ¶ 16.) On March 16, 2007, Banc of America, via Steve Ryder, terminated Titus-Morris due to her continued substandard performance. (*Id.*, Ex. 2 at ¶ 9.)

On December 13, 2007, Titus-Morris filed a Charge of Discrimination ("Charge") with the Delaware Department of Labor. (*Id.*, Ex. 3 at 35.) The Charge was subsequently transferred to the Equal Employment Opportunity Commission ( the "EEOC"). (*Id.* at 38.) The EEOC was unable to determine that Banc of America violated Title VII and, on September 11, 2009, issued a Dismissal and Notice of Right to Sue to Plaintiff. (*Id.* at 38.) As noted, on December 17, 2009, Titus-Morris filed a *pro se* Complaint in this court, alleging Title VII claims. (D.I. 2 at ¶¶ 1, 10.)

4

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also* Celotex *Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material facts exists, the district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing FED. R. CIV. P. 56(e)).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). As such, a nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to

5

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

Banc of America claims that Titus-Morris cannot establish her Title VII claims because she: (1) was terminated from employment due to months of substandard performance (D.I. 19 at 8); and (2) was issued warnings related to her substandard performance throughout her employment, such that she was aware of her need to improve (*id.*). Banc of America further contends that Titus-Morris has not established a *prima facie* case of discrimination or retaliation and, in the alternative, that even if such allegations were established, Titus-Morris has not offered evidence of pretext for discrimination or retaliation. (*Id.*) Finally, Banc of America argues that Titus-Morris' allegations, in whole or in part, are time-barred.

Conversely, Titus-Morris asserts that she has established her Title VII claim "with original documentations," that the "burden of proof has been met," and that Banc of America's discrimination against her "based on race, sex, religion, national origin, Retaliation/termination of employment" have caused "emotional, psychological, financial and marital bankruptcy/pain and suffering." (D.I. 21 at 1.) The court examines the parties' arguments below.

6

### A. Statute of Limitations under Title VII

Under 42 U.S.C. § 2000e-5, "[a] claimant bringing a charge of discrimination under Title VII in Delaware has 300 days from the time of the alleged discriminatory act to file a complaint with the EEOC." *Riley v. Delaware River and Bay Auth.*, 457 F. Supp. 2d 505, 510 (D. Del. 2006). Titus-Morris filed a Charge of Discrimination with the EEOC on December 13, 2007. (D.I. 19, Ex. 3 at 35.) Based on the date of this filing, Banc of America argues that any claim grounded on events occurring prior to February 16, 2007 should be dismissed as time-barred, because they occurred more than three hundred days before Titus-Morris filed her EEOC complaint and were not "continuing" violations that would extend the statute of limitations. (D.I. 19 at 14 n.8.)

With regard to the substance of the Charge of Discrimination allegations, Titus-Morris asserted a "hostile work environment," in addition to discrimination and retaliation. (D.I. 19, Ex. 3 at 35.) While Titus-Morris did not check the "CONTINUING ACTION" box on her Charge of Discrimination, this "failure to check a particular box is not fatal to [her] Title VII action" as courts in the Third Circuit are instructed to "liberally construe EEOC charges." *Ward v. MBNA Am.*, C.A. No. 10-759-SLR, 2012 WL 82773, at *5 (D.Del. 2012). Under the "continuing violations" theory, an equitable exception, a plaintiff may pursue a discriminatory conduct claim that began more than three hundred days before the filing of a Charge of Discrimination "if [the plaintiff] can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). Importantly, the continuing violations theory "only applies when the alleged discriminatory acts are not individually actionable, but when aggregated may make out a hostile work environment claim." *Ward*, 2012 WL 82773, at *3 (citing *McCann v. Astrue*, 293 F. App'x 848, 850 (3d Cir. 2008)).

7

Moreover, "one of the acts contributing to the hostile environment claim [must have] occurred within the statute of limitations period" for all of the acts comprising the hostile environment claim to be considered. *Riley*, 457 F. Supp. 2d at 511.

To prevail on a hostile environment claim, a plaintiff must demonstrate that the harassment was objectively and subjectively "severe or pervasive." *See Wellman v. DuPont Dow Elastomers, L.L.C.*, 739 F. Supp. 2d 665, 672 (D.Del. 2010) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). To this end, "offhand comments" and isolated incidents do not rise to the level of discriminatory behavior. *Id.* (citing *Faragher*, 524 U.S. at 787-88). In assessing whether a hostile environment exists, trial courts are instructed to consider, in addition to the nature of the conduct, whether the action(s) in question "unreasonably interfere[d] with [the] employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Titus-Morris contends that she was subjected to religious and sexual discrimination by a manager, Jeff Reymos, in 2004. (D.I. 2, Ex. at 21.) In support of her religious discrimination allegation, Titus-Morris asserts that Reymos criticized her leadership qualities in an evaluation because she did not go to a pub with the rest of her team due to her religious views. (*Id.*) Specifically, Titus-Morris states that she told Reymos that her religious views precluded her from joining the team at a bar, but that he "made it a part of my review," stating that "I did not show leadership qualities when I did not participate in these outings." (*Id.*) In support of her sexual discrimination allegation, Titus-Morris asserts that Reymos "would yell at/correct me in front of my peers, he would stay in his office cubicle and call for me; while he would do the opposite for my peers. He would meet them in his office cubicle, in a conference room or go by their desk." (*Id.*) Titus-Morris notes that she told Reymos that she "took exception for said and

that I have observed a difference; yet he continued to do said [actions]." (*Id.*) Titus-Morris further states that five months after these incidents, she was "taken off PFS" and worked under two new managers. (*Id.* at 22.) Based on the allegations detailed, the court concludes that Reymos' alleged actions were not "severe" within the meaning of the statute and, further, that they did not "unreasonably interfere" with Titus-Morris' work performance. *See Wellman*, 739 F. Supp. 2d at 672 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). Moreover, the court also finds that Titus-Morris' religious and sexual discrimination claims are time-barred by Title VII, as they were not brought within three hundred days of the alleged discriminatory acts and, in view of relevant law, were isolated in nature. *See Ward*, 2012 WL 82773, at *3 (citing *McCann v. Astrue*, 293 F. App'x 848, 850 (3d Cir. 2008)).

As to her racial discrimination claim, Titus-Morris alleges that a manager, Jim Wilson, called her "aggressive" in early 2007. Tr. at 221:16-19. It is clear that this event occurred prior to February 16, 2007 because Titus-Morris complained about this incident to Ryder on February 2, 2007. (*Id.*, Ex. 2 at 8.) Titus-Morris also alleges that another manager, Sulecki, saw Titus-Morris wearing a head tie in the office and asked why "only Black women wear head ties outside of the house." (D.I. 2, Ex. at 27.) Although Titus-Morris does not identify the date on which this event occurred, the record indicates that Sulecki served as Titus-Morris' manager beginning in August 2006. (D.I. 19, Ex. 3 at 11, ¶ 2.) Titus-Morris concedes that the events involving Wilson and Sulecki were singular occurrences. Tr. at 221:16-24; *id.* at 189:23-24.) Upon review of these allegations, the court concludes, for the reasons stated above, that Titus-Morris' racial discrimination claims are likewise time-barred as they did not occur within the timeframe required by the statute and were isolated incidents.

## B. The *McDonnell* Framework

The court notes that, even assuming Titus-Morris' claims were not time-barred under Title VII, Titus-Morris cannot carry her burden of establishing a *prima facie* case under the *McDonnell* framework. A plaintiff's discrimination and retaliation claims, under Title VII, are analyzed under the *McDonnell* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972); *Shahin v. Delaware*, C.A. No. 07-644-GMS, 2010 WL 4975653, at *4 (D. Del. 2010); *Berry v. Delaware*, C.A. No. 06-217-GMS, 2008 WL 906104, at *2-3 (D. Del. 2008). Under this framework, a plaintiff is required to establish a *prima facie* case of discrimination or retaliation. *Id.* If the plaintiff meets this burden, the burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Id.* If this burden is met, the plaintiff is then required to demonstrate that the defendant's asserted rationale is pretextual. *Id.* If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *Id.*

## C. Titus-Morris Has Not Established a *Prima Facie* Case of Discrimination

In consideration of the relevant standard, the court concludes that Titus-Morris has not establish a *prima facie* case of discrimination. To establish a discrimination claim, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff suffered an adverse employment decision; and (4) this decision occurred under circumstances giving rise to an inference of discriminatory action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). While the *prima facie* test is flexible and must be tailored to fit the specific context in which it is applied, the main focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Id.* at 797-98 (citation omitted). Banc of America

10

concedes that the first and third elements are not at issue because Titus-Morris "was a member of a protected class and the termination of her employment constituted an adverse employment action." (D.I. 19 at 16.) Consequently, the court considers only the remaining two elements.

### 1. *Whether Titus-Morris Was Qualified to Serve as a Fraud Analyst*

Banc of America contends that Titus-Morris "was not qualified for her position [at the time of her termination] as a result of her objectively and indisputably below standard job performance." (*Id.*) Nevertheless, if a plaintiff receives favorable performance reviews for years and subsequently is subjected to corrective action "for persistent performance problems which ultimately lead to the termination of [their] employment," a reasonable jury could conclude that the plaintiff was qualified for the position. *Blozis v. Mellon Trust of Delaware Nat. Ass'n*, 494 F. Supp. 2d 258, 268 (D. Del. 2007) (discussing whether a plaintiff is "qualified" under the Age Discrimination in Employment Act under the *McDonnell* framework). Thus, even if an employee receives poor performance reviews immediately after obtaining an employment position, poor performance is "more appropriately directed to the issue of whether legitimate business reasons existed for employment decisions, than to whether [the plaintiff was] qualified in the first instance for their [position]." *Romdhani v. Exxon Mobil Corp.*, 2011 WL 722849, at *13 (D. Del. 2011).

As Banc of America demonstrates, Titus-Morris received unfavorable performance evaluations throughout her employment. (D.I. 19 at 9-10.) Nevertheless, Titus-Morris showed her ability to meet her performance goals over a number of months, including a period of time spanning from "late 2005 [through] the first three quarters of 2006." (*Id.* at 10-11.) Thus, based upon her ability to periodically meet performance goals, a reasonable jury could conclude that Titus-Morris was qualified to review potentially fraudulent credit card applications, perform data

11

verifications, and make decisions whether to approve, deny, and, if necessary, request additional information on each application. (D.I. 19, Ex. 3 at ¶ 3.) In view of the foregoing, the court concludes that Titus-Morris has established that she was a qualified employee.[4]

## 2. *Whether Titus-Morris' Termination Resulted from Banc of America's Discriminatory Action*

In light of the evidence before it, the court concludes that Titus-Morris has failed to show that her termination was based on religious, sexual, or racial discrimination. The court addresses each of Titus-Morris' allegations in turn. First, and as noted above, Titus-Morris claims that her religious beliefs prohibited her from attending out of work functions with her team at establishments that serve alcohol, and that she received a poor "leadership" evaluation as a result, even though her manager was aware she could not attend because of religious reasons. D.I. 2, Ex. 1 at 21; *see also* Tr. at 92:15-24, 95:1-5. Titus-Morris asserts that her poor performance review constitutes religious discrimination. Nevertheless, Titus-Morris does note that she attended outings with coworkers when the venue was not a club or bar. (D.I. 2, Ex. 1 at 27.) Moreover, a review of the 2004 evaluation in question reveals that Reymos' performance critique of Titus-Morris simply stated that she should be a team player in "all job aspects." (D.I. 19, Ex. 2 at 20.) Reymos also provided Titus-Morris with a leadership assessment of "Good." (*Id.*) Following this singular event, Titus-Morris was not fired, demoted, or docked pay. As such, the court concludes that there was no adverse employment decision that related to religious discrimination alleged based on the September 2004 evaluation. *See Price v. Delaware Dep't of Corr.*, 40 F. Supp. 2d 544, 552 (D. Del. 1999).

---

[4] The court notes that Titus-Morris' poor performance is more relevant to whether legitimate business reasons existed for Banc of America's employment decision. *Romdhani*, 2011 WL 722849, at *13.

12

Second, Titus-Morris contends she was subjected to sexual discrimination when she was yelled at or corrected in front of her peers by a male manager, Reymos. (D.I. 2, Ex. 1 at 21.) Titus-Morris claims that her "peers" were treated differently. (*Id.*) In using the term "peers," a term which could include both men and women, Titus-Morris does not clearly identify similarly situated employees outside of her protected group who were treated more favorably. *Taylor v. Potter*, C.A. No. 02-1619-KAJ, 2004 WL 1859782, at *3 (D. Del. 2004). Even if she did, however, Titus-Morris was not fired, demoted, or docked pay after being yelled at or corrected in front of her peers. *Price*, 40 F. Supp. 2d at 552. Rather, Titus-Morris was terminated after months of poor performance and during a meeting involving two different managers than the one involved here. (D.I. 19, Ex. 2 at ¶¶ 8-9.) As a result, the court finds that there was no adverse employment decision associated with the alleged sexual discrimination incidents. *Price*, 40 F. Supp. 2d at 552.

Third, Titus-Morris claims she was subjected to racial discrimination when her manager, Wilson, called her "aggressive." (D.I. 19, Ex. 3 at 25.) Titus-Morris' allegation that calling an African American woman "aggressive" constitutes racial discrimination, however, is unsupported in the record. Specifically, Titus-Morris has failed to show, "aside from [her] own interpretation," that Wilson's "characterization of [her being aggressive] was in any way based upon racist views" or discriminatory animus. *See Smith v. Hous. Auth. of Cnty. of Dauphin*, 2010 WL 4916709, at *10 (M.D. Pa. 2010), *aff'd* 439 Fed. App'x 140 (3d Cir. 2011). Titus-Morris also states that although she made Wilson aware that she felt that the term "aggressive" was the equivalent of the "N" word, Wilson continued to use the term. Tr. at 222:3-24. Nevertheless, stray remarks made "by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote

13

from the date of decision." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). Thus, in light of relevant case law, the court finds that Wilson's alleged racial discrimination was not connected with the decision to terminate Titus-Morris' employment, such that she suffered adverse employment action as a result of it.

Additionally, Titus-Morris alleges she was subjected to racial discrimination when a manager, Sulecki, saw Titus-Morris wearing a head tie in the office and asked why "only Black women wear head ties outside of the house." (D.I. 2, Ex. at 27.) However, as noted above, relevant case law makes clear that a single statement, such as this, without more, does not allow for an inference of racial discrimination. *See Poland v. Computer Scis. Corp.*, C.A. No. 04-217-GMS, 2005 WL 2454945. at *2, *6 (D. Del. Oct. 5, 2005) (concluding that the statement "why do Black people dress up for church and why is the[ir] music so loud," without more, was insufficient to show racial discrimination). Titus-Morris acknowledges that Suleck's statement was a "one-time thing" and that after she told Sulecki that she did not appreciate the remark, Sulecki no longer made such comments. Tr. at 189:10-24. Consequently, such a stray comment by a "nondecisionmaker . . . unrelated to the decision process" fails to establish that Titus-Morris' termination resulted from racial discrimination. *See Ezold*, 983 F.2d at 545.

### D. Titus-Morris Has Failed to Establish a *Prima Facie* Case of Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) the plaintiff was engaged in activity protected by Title VII; (2) the plaintiff suffered an adverse employment decision; and (3) there was a causal connection between the plaintiff's participation in the protected activity and the adverse employment decision. *Berry*, 2008 WL 906104, at *3. Banc of America concedes that the second element of the prima facie case of discrimination is not at issue because Titus-Morris did in fact "suffer[] an adverse action." (D.I. 19 at 19.)

14

### 1. *Whether Titus-Morris Was Engaged in Activity Protected By Title VII*

Title VII aims to protect individuals who complain to a superior during a performance review about the conduct of their supervisor. *Shomide v. ILC Dover, Inc.*, 521 F. Supp. 2d 324, 336, 339 (D. Del. 2007). A party can also engage in protected activity under Title VII if that individual makes a discrimination complaint approximately three years after the alleged unfair treatment and discriminatory conduct commenced. *Id.* at 328, 335-39.

In the case at hand, Titus-Morris complained about her various former managers to Ryder on February 2, 2007. (D.I. 19, Ex. 2 at ¶ 4.) Titus-Morris also sent an email to Ken Lewis, the CEO, President, and Chairman of Bank of America, and Bruce Hammonds, the Card Services Executive, relaying essentially the same complaints presented to Ryder. (*Id.*, Ex. 3 at 25.) As noted, Titus-Morris complained to her superiors that she was subjected to: religious discrimination in September 2004; sexual discrimination in 2004; and racial discrimination during August 2006 as well as in early 2007. As such, Titus-Morris engaged in protected activity under Title VII. *Shomide*, 521 F. Supp. 2d at 328, 335-39.

### 2. *Whether There is a Causal Connection between Titus-Morris' Participation in the Protected Activity and the Adverse Employment Decision*

In view of the record before it, the court concludes that there is no causal connection between Titus-Morris' participation in the protected activity and the adverse employment decision she suffered. Indeed, the only fact suggestive of such a causal connection is the timing of her termination. Titus-Morris made her complaints in February 2007 and her employment was terminated in March 2007. However, simply because an adverse employment action occurs after a complaint does not ordinarily mean that the plaintiff has satisfied the burden of demonstrating a causal connection between the two events. *Robinson v. Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997). Even if timing alone could be sufficient to demonstrate a causal

connection, for a causal connection to be inferred, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). Further, when a plaintiff's performance evaluations contain similar criticisms before and after the protected activity, the Third Circuit has established that there is no evidence that the plaintiff's evaluations were causally linked to the filing of the plaintiff's complaint or were motivated by discriminatory or retaliatory intent. *Shaner v. Synthes*, 204 F.3d 494, 504-05 (3d Cir. 2000).

Here, Titus-Morris' complaints were filed after she failed to achieve performance standards for three consecutive months and after she was informed her employment was in jeopardy. Thus, the court finds that there is no causal connection between Titus-Morris' participation in the protected activity and the adverse employment decision. *Robinson*, 120 F.3d at 1302.

### E. Titus-Morris Has Not Demonstrated That Banc of America's Termination Rationale Was Pretextual

Assuming arguendo, that Titus-Morris could establish a *prima facie* case of discrimination or retaliation, the burden would then shift to Banc of America to articulate one or more legitimate, nondiscriminatory reasons for its actions. *Shahin*, 2010 WL 4975653, at *4. The Third Circuit has instructed that continued failure to meet performance expectations is a "legitimate, non-discriminatory reason" for firing an individual. *Tarr v. FedEx Ground*, 398 F. App'x 815, 820 (3d Cir. 2010). Thus, because Banc of America has provided such rationale, Titus-Morris must demonstrate that the rationale is pretextual to survive summary judgment. *Berry*, 2008 WL 906104, at *2. To do so, Titus-Morris must point "to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more

16

likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Daughtry v. Family Dollar Stores, Inc.*, C.A. No. 08-963-SLR, 2011 WL 4943927, at *8-9 (D. Del. 2011).

### 1. *Titus Morris Has Not Established the First Fuentes Prong*

A plaintiff may overcome summary judgment under the first *Fuentes* prong by providing evidence that the employer's reason for terminating employment "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764. More specifically:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Id.* at 765 (citations and quotations omitted).

Titus-Morris has not offered evidence showing that Banc of America's reason for terminating her employment was a *post hoc* fabrication or did not actually motivate the employment action. In fact, Titus-Morris admits that she was not meeting the required productivity levels. Tr. at 197: 2-11, 210:1-10, 211:4-7, 243:13-16.) In connection with this issue, it is immaterial that Titus-Morris reached the required productivity levels in the past. *Ezold*, 983 F.2d at 528.

Titus-Morris claims that she should not have been held to the performance standard for February 2007 because she was absent for more than half of the month. (D.I. 2, Ex. at 6; D.I. 19, Ex. 1 – Pt. 1 at 61, ll. 1-8.) However, as Ryder stated in his Declaration, Fraud Analysts are

17

expected to meet Banc of America's performance levels regardless of the amount of time they are away from work. (*Id.*, Ex. 2 at ¶ 10.) Thus, Titus-Morris has not established the first *Fuentes* prong.

### 2. *Titus-Morris Has Not Established the Second Fuentes Prong*

Titus-Morris has similalry failed to establish the second *Fuentes* prong. A plaintiff may overcome summary judgment under the this prong by providing "evidence with sufficient probative force that a fact finder could conclude by a preponderance of the evidence that [a protected category] was a motivating or determinative factor in the employment decision." *Simpson*, 142 F.3d at 644-45. As discussed above, there is no evidence that Titus-Morris' religion, sex, or race was a motivating factor in the decision to terminate her employment. Titus-Morris was terminated after failing to meet performance expectations over a number of months after being warned about the consequences of failing to meet these performance expectations.

As to retaliation, a plaintiff must prove that they would not have been terminated but for their complaint(s) of discrimination. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.8 (3d Cir. 2007). A plaintiff cannot rely "merely on a post hoc, ergo propter hoc inference from the fact that the [adverse action occurred] after [the] complaint." *Burton v. MBNA Am. Bank, N.A.*, 2005 WL 1463533, at *4 (D.Del. 2005) (quoting *Robinson*, 120 F.3d at 1302). Although Titus-Morris' employment was terminated following her complaints, she was terminated after failing to meet performance expectations over a number of months after being warned about the consequences of failing to meet these performance expectations. Thus, Titus-Morris has not established the second *Fuentes* prong.

### IV. CONCLUSION

18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PAULETTE TITUS-MORRIS, )
)
Plaintiff, )
)
v. ) C.A. No. 09-cv965
)
BANC OF AMERICA CARD SERVICING )
CORP., )
)
Defendant. )

## **ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that:

1. The defendants' Motion for Summary Judgment (D.I. 18) is GRANTED; and

2. The Clerk of Court is directed to close this case.

Dated: March 30, 2012

CHIEF, UNITED STATES DISTRICT JUDGE

For the reasons stated above, the court will grant Banc of America's Motion for Summary Judgment (D.I. 18.)

Dated: March 30, 2012

CHIEF, UNITED STATES DISTRICT JUDGE